Opinion issued April 9, 2009









In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00745-CR






DANIEL LESSO, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 339th District Court

Harris County, Texas

Trial Court Cause No. 1068284






O P I N I O N


 A jury convicted appellant, Daniel Lesso, of aggravated assault. After finding
that appellant used or exhibited a deadly weapon, the jury assessed appellant's
punishment at 20 years in prison. In three points of error, appellant argues that
appellant's trial counsel was ineffective and that the evidence presented at trial was
both legally and factually insufficient to sustain his conviction.

 We affirm.

Background

 On March 11, 2006, appellant attempted to patronize the Palace Nightclub, an
after-hours club, at 5600 Richmond in Houston, Texas. Appellant and his party were
turned away by the security staff of the nightclub. Appellant or a member of
appellant's party threatened Abel Diaz, a commissioned security officer, and Frank
Cobas, the nightclub manager, and told them the staff had made a mistake in refusing
entry to appellant's party and that appellant's party would return. 

 The complainant, Ryan Gonzales, was employed at the Palace Nightclub as a
bouncer. He arrived in the parking lot of the nightclub on March 11, 2006 at 3 a.m.
to begin his shift. The complainant sat in his girlfriend's car to change from the
clothes he had worn at his other job to the security outfit required by the nightclub. 
The complainant's outfit consisted of a black shirt with the word "staff" written in
bold white capital letters on the back and was identical to the shirts worn by all the
nightclub's bouncers except for Diaz. The complainant bore a strong resemblance to
Cobas. The complainant left his girlfriend's car to walk toward the nightclub, and she
drove out of the nightclub parking lot. As he was walking toward the nightclub, the
complainant heard gunshots and started telling the patrons standing in the parking
area to escape. As he was standing by a tree and directing foot and car traffic out of
the parking area, he saw appellant holding a black gun. 

 About two minutes after appellant's party left the nightclub, Diaz heard
gunshots somewhere outside the nightclub and went out to investigate. Diaz
discovered that appellant was shooting at the complainant, and the complainant was
trying to find cover behind the many vehicles in the parking lot. Diaz shouted to the
complainant to take cover and Diaz then began to fire his .40 caliber Smith and
Wesson weapon at appellant. Appellant and his party fired back at Diaz from within
a white Chrysler 300 sedan and a maroon Cadillac Escalade. Neither Diaz nor
appellant was struck by gunfire.

 After appellant and his party drove out of the parking lot of the nightclub, Diaz
and other staff members attended to the complainant. The complainant was struck in
both legs--twice in the right leg and once in the left leg. Diaz made a tourniquet out
of his belt to stem the blood loss from one of the legs. The complainant was taken to
Hermann Memorial Hospital where he underwent emergency surgery to take an artery
out of his left leg and transplant the artery into his right leg. He stayed in the hospital
for five months under an assumed name for security reasons. Because he lacked
health insurance, the complainant was sent home without benefit of physical therapy
and had to learn to walk again on his own. 
 Houston Police Department ("HPD") homicide investigator A.R. Mathews was
assigned the case several days after it happened. He testified that he met with the
owner of the nightclub and watched a videotape taken that night that showed patrons
entering or attempting to enter the club. He also reviewed the original offense report,
which contained two license plate numbers provided to the officers who arrived at the
scene by security guards who were present at the club on the night of the shooting. 
Mathews identified a license plate number to a white Chrysler 300. He testified that
he produced the photo spread after viewing footage from the nightclub's security 
camera and using the license plate information, towing information, and police
records to find a photograph of appellant. He placed appellant's picture in the photo
spread alongside five other pictures of "persons with similar characteristics, physical
characteristics, race, facial characteristics, [and] facial hair." The other persons in the
photo spread were not associated with the assault. 

 On March 15, 2006, five days after the shooting, Mathews took the photo
spread to the complainant, who was recuperating in Memorial Hermann Hospital. He
gave the complainant an admonishment that the complainant was "not under any
obligation to pick" anyone depicted in the photo spreads. The complainant spent 5
or 10 seconds looking at each photo in the array and picked out appellant as "the man
in No. 3." When Mathews asked the complainant if he was certain that appellant was
the assailant, the complainant replied, "That's the guy that shot me." 

 On April 7, 2006, approximately three weeks after the shooting, Mathews
returned to the hospital to get a second identification from the complainant because
the complainant had been medicated during the initial identification. Mathews
showed the complainant the original photo spread, and the complainant again
identified the appellant as the person pictured in the third position of the photo spread
and stated that appellant was the assailant. 

 On April 13, 2006, Mathews took the original photo spread used with the
complainant to Diaz, while Diaz was working at Sharpstown Mall. Mathews gave
Diaz an admonishment not "to pick anybody if you don't see them, but if you see
them, point them out." Diaz identified appellant as the person pictured in the third
position in the photo spread and told Mathews that appellant was the assailant. 
Mathews also prepared a couple of other photo arrays in connection with the shooting
and showed them to Diaz, but Diaz was not able to identify anyone from these arrays. 
Mathews did not show the other photo arrays to the complainant.

 After obtaining identifications from the complainant and Diaz, Mathews
brought the evidence he had gathered to the Harris County District Attorney's office. 
The district attorney's office brought a charge of aggravated assault, and appellant
was arrested on May 23, 2006. 

 The complainant saw appellant at a nightclub a week prior to trial. The
complainant had a brief conversation with appellant without incident. 

 Appellant's trial counsel, James Tucker Graves, did not file a motion to
suppress the photo spread; nor did he object when the State offered the photo spread
for admission into evidence at trial; nor did he object to the complainant's or Diaz's
in-court identification of appellant as the assailant. However, he cross-examined the
complainant regarding his recollection of appellant's attire at the time of the assault. 
Graves also cross-examined the complainant about other factors that might have
clouded the complainant's identification, including his alcohol consumption prior to
the assault, his work schedule prior to the assault, the lighting in the nightclub's
parking lot, and time gaps in the complainant's direct testimony. He also cross-examined Diaz about nightclub patrons other than appellant whom Diaz might have
seen committing the assault and about other factors that might have clouded the
complainant's identification, including Diaz's identification of the car used by
appellant immediately after the assault and time gaps in the complainant's direct
testimony. 

 After his conviction, appellant hired new counsel to prepare his motion for new
trial and to participate in the trial court's hearing on the motion. Appellant also
obtained an affidavit from his original trial counsel, Graves. Graves testified that he
failed to file a motion to suppress evidence of the out-of-court identification of
appellant with police-produced photo spreads and that he did not object to the in-court identification of appellant because "it was my understanding of the law that if
two or more people identify someone from a photo spread that you would not be
filing the motion to suppress in good faith." Graves also testified that he "did not
believe, in good faith, that a motion to suppress the identification was relevant and
. . . this was my trial strategy." He further testified that he did not object to the
admission of the photo spread or to the in-court identifications of appellant for the
same reasons. 

 Appellant obtained an affidavit from a legal expert on pretrial eyewitness
identifications. The expert, Kathryn Kase, stated it is a "standard of practice" that a
defense attorney will file a motion to suppress any pretrial identification evidence to
determine "whether the identification was suggestive." Kase stated that it is a
"standard of practice that a defense attorney will seek to suppress an identification
involving a photo spread when the police officer who showed the photo spread also
was the same individual who prepared [the photo spread]." She also stated that it is
a "standard of practice that the defense attorney will move to suppress the
identification on the basis of taint where the eyewitness was shown, in quick
succession, a photo spread containing the defendant and a videotape containing the
defendant." The trial court denied appellant's motion for new trial and held that the
procedure used to obtain the witnesses' out-of-court identifications was not unduly
suggestive. The trial court also held that, even if the procedure was suggestive, it was
not so suggestive as "to render the identification unreliable." 


Ineffective Assistance of Counsel


 In his first point of error, appellant argues that the trial court erred in denying
his motion for new trial because he was denied effective assistance of counsel at trial
in violation of the Sixth and Fourteenth Amendments of the United States
Constitution. (1)

 Appellant contends that his trial counsel's representation was constitutionally
defective because he failed to file a motion to suppress out-of-court identifications
of appellant based on the use of an impermissibly suggestive photo spread by HPD
Officer A.R. Mathews and did not object to the admission of the photo spread into
evidence at trial or to the in-court identifications of appellant by the complainant and
Diaz. 

 Standard of Review of Ineffective Assistance

 We evaluate the effectiveness of counsel under the two-pronged test enunciated
in Strickland v. Washington, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984);
Hernandez v. State, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999). First, the appellant
must show that his trial counsel's representation fell below an objective standard of
reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. To prove this
deficiency in representation, the appellant must demonstrate that his counsel's
performance deviated from prevailing professional norms. Id. at 688, 104 S. Ct. at

2065. Second, he must show prejudice. Id. at 687, 104 S. Ct. at 2064. To show
prejudice, the appellant must show a reasonable probability that, but for his counsel's
unprofessional errors, the result of the proceeding would have been different. Id. at
694, 104 S. Ct. at 2068. When an appellant fails to satisfy one prong of the
Strickland test, the reviewing court need not consider the other prong. Id. at 697, 104
S. Ct. at 2069. We conclude appellant has failed to establish the second prong. 

 When an ineffective assistance claim alleges that counsel was deficient in
failing to move to suppress or to object to the admission of evidence, the defendant
must show, as part of his claim, that the evidence was inadmissible and that the
motion to suppress or the objection would have been granted. Ortiz v. State, 93 S. W.
3d 79, 93 (Tex. Crim. App. 2002) (failure to move to suppress); Jackson v. State, 973
S.W.2d 954, 957 (Tex. Crim. App. 1998) (failure to object to evidence). An appellate
court reviews a trial court's ruling on a motion to suppress identification under an
abuse of discretion standard. See Villarreal v. State, 935 S.W.2d 134, 138 (Tex.
Crim. App. 1996).

 Appellant argues that his counsel deviated from professional norms and
prejudiced appellant by failing to move to suppress an impermissibly suggestive
photo spread and failing to object to the admission of the photo spread and
identification testimony. Appellant had the burden of proof to show that the photo
array and the identification testimony were inadmissible and, therefore, that the
motion to suppress and the objection to testimony would have been granted. 

 Failure to Move to Suppress Photo Spread or to Object to Admission of
Identification Testimony


 Relying on the affidavit of Kathryn Kase, appellant's expert on suggestive
photographic identification procedures, appellant contends on appeal that it is
standard practice for a defense attorney to move to suppress a potentially suggestive
out-of-court photographic identification, including an out-of-court identification
"involving a photo spread when the police officer who showed the photo spread also
was the same individual who prepared it." Appellant further contends, on the same
basis, that it is a "standard of practice" for a defense attorney to move "to suppress
the identification on the basis of taint where the eyewitness was shown, in quick
succession, a photo spread containing the defendant and a videotape containing the
defendant." And appellant contends that it is "a fundamental rule of photo array
construction" that fillers generally match the original description given by the witness
rather than matching the description of a suspect. Thus, by using fillers whose
description matched that of appellant, whom Mathews identified from the license
plate and security photos from the nightclub, rather than matching the fillers in the
array to a description given by the witnesses, from whom no description had been
taken, Mathews "violated Appellant's due process rights." In addition, appellant
contends, on the basis of the same expert affidavit, that the array was impermissibly
suggestive because Mathews knew the identity of the suspect and was therefore
"likely to give inadvertent cues" that supported the identification of appellant and
increased its likelihood.

 Appellant also contends that Mathews' multiple uses of the photo spread made
the pre-trial identification procedure impermissibly suggestive. And he contends that
Diaz's having viewed appellant at a nightclub a week prior to trial made his in-trial
identification of appellant inadmissible for the same reason.

 Pretrial Identification

 A pretrial identification procedure may be so suggestive and conducive to
mistaken identification that subsequent use of that identification at trial would deny
the accused due process of law. Neil v. Biggers, 409 U.S. 188, 197, 93 S. Ct. 375,
381 (1972); Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 970-71
(1968); Barley v. State, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995); Jackson v.
State, 657 S.W.2d 123, 127 (Tex. Crim. App. 1983); Page v. State, 125 S.W.3d 640,
646 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd). A pretrial identification
procedure is impermissibly suggestive when it would "give rise to a very substantial
likelihood of irreparable misidentification," thereby violating a defendant's due
process rights. Neil, 409 U.S. at 197, 93 S. Ct. at 381; Jackson, 657 S.W.2d at 127. 
"[R]eliability is the linchpin in determining the admissibility of identification
testimony." Jackson, 657 S.W.2d at 128. 

 Whether there has been a deprivation of due process is determined from the
totality of the circumstances. Jackson, 657 S.W.2d at 127. Thus, an appellate court
applies a two-step analysis to determine the admissibility of an in-court identification,
asking (1) whether the pretrial identification procedure was impermissibly suggestive
and, if so, (2) whether the improperly suggestive procedure created a very substantial
likelihood of irreparable misidentification. Page, 125 S.W.3d at 647. 

 "[T]he factors to be weighed against the corrupting effect of a suggestive
identification procedure in assessing reliability are those set out in Neil." Jackson,
657 S.W.2d at 128. To determine the likelihood of irreparable misidentification
under the totality of the circumstances, we use several factors, namely, "(1) the
opportunity of a witness to see the criminal at the time of the crime, (2) the witness'
degree of attention, (3) the accuracy of the witness' prior description of the criminal,
(4) the level of certainty demonstrated by the witness at the time of the confrontation,
and (5) the length of time between the crime and the confrontation." Neil, 409 U.S.
at 199, 93 S. Ct. at 382; Jackson, 657 S.W.2d at 130.

Impermissibly Suggestive Pre-Trial Identification Procedure

 Mathews testified that he produced the photo spread after viewing footage from
the nightclub's security camera and using license plate information, towing
information and police records to find a photograph of appellant. He placed
appellant's picture in the photo spread with five other pictures of "persons with
similar characteristics, physical characteristics, race, facial characteristics, [and] facial
hair." Mathews showed the photo spread to the complainant twice while the
complainant was in the hospital--once five days after the shooting while the
complainant was sedated and again three weeks later when he was not. Mathews
showed the same photo spread separately to Diaz a week after showing it to the
complainant a second time. Matthews admonished both witnesses that they need not
pick anyone depicted on the photo spread. Both witnesses picked appellant as the
assailant. 

 Appellant cites no case law supporting his contentions that using a photo
spread is impermissibly suggestive when (1) the photo spread is prepared by the
officer who showed it to the witnesses, (2) the fillers in the array match a suspect
identified from a surveillance camera photo and a license plate rather than matching
a witness's description, or (3) the officer who shows the photo spread knows the
identity of the suspect, and we have found none. Nor is there any evidence in the
record that the use of any of these procedures influenced the identification of
appellant by the complainant or Diaz. Therefore, we decline to find the use of any of
these pre-trial identification procedures impermissibly suggestive in this case.

 It may be impermissibly suggestive to show a witness the defendant's picture
multiple times, if, under the totality of the circumstances, the multiple uses of the
photo spread would lead to a "substantial likelihood of irreparable misidentification." 
See Cantu v. State, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987) (holding that
practice of showing witnesses several photo displays on different occasions, each
containing photo of suspect, whom witness had not previously identified, was
suggestive procedure); see also Barley, 906 S.W.2d at 33 (cumulative effect of photo
spread may be suggestive); but see Page, 125 S.W.3d at 647 (showing photographic
array to witnesses in which all persons pictured were African-American, were
wearing civilian clothes, had short black hair, and appeared to be similar in age was
not impermissibly suggestive). Here, the photo spread was used twice with only one
witness--the complainant--who was heavily sedated the first time he was shown
appellant's photo. Neither then nor three weeks later, when not sedated, did he
hesitate to identify appellant. Diaz was shown the same photo spread as the
complainant, in which he immediately identified appellant. He was also shown
additional photo arrays in which appellant did not appear, and he did not identify
anyone. We decline, therefore, to conclude that the multiple usage of the photo
spread with the complainant was impermissibly suggestive under the circumstances
of this case.

 We conclude that the pretrial identification procedure used in this case was not
impermissibly suggestive. Nevertheless, even if we had found the photo spread or
its use impermissibly suggestive, we would still conclude that there was no
substantial risk of misidentification in this case.



Substantial Risk of Misidentification

To determine the risk of irreparable misidentification from the use of an
impermissibly suggestive pretrial identification procedure, we examine the totality
of the circumstances under the factors set out in Neil. 409 U.S. at 199, 93 S. Ct. at
382.

(1) Opportunity to view

The complainant and Diaz both saw appellant point a black gun at the
complainant and fire it. The complainant testified that appellant was standing under
a direct light when appellant began his assault. Diaz viewed appellant in the minutes
just before the assault when appellant and his party attempted to enter the Palace
Nightclub. Both the complainant and Diaz saw appellant standing next to a white
Chrysler 300 sedan, which Mathews later traced to appellant. Diaz also saw appellant
holding the gun and shooting at the complainant. 

(2) Witnesses' degree of attention

The complainant tried to move away from appellant and take cover as appellant
was firing his weapon at him. The complainant took note of appellant's position
standing next to the white Chrysler 300 sedan under a direct light in order to facilitate
an escape. Diaz tried to shoot appellant to prevent him from further assaults on the
complainant. Diaz trained his gaze on appellant to fire his weapon at appellant. Diaz
noted that appellant was standing next to a white sedan and fired several rounds at
appellant. 

(3) Accuracy of description

Neither the complainant nor Diaz gave a description of appellant to Mathews
prior to the production of the photo spread. However, Mathews got a description of
appellant's vehicle and obtained the license plate number. Mathews also had video
images from the nightclub when appellant and his party attempted to enter the
nightclub. After getting towing information and police records using the license plate 
information, Mathews discovered a picture of appellant in police files.

(4) Level of certainty

While he was in the hospital, the complainant twice identified appellant as his
assailant after viewing the photo spread produced by Mathews five days after the
complainant was shot. Diaz also quickly identified appellant as the assailant after
viewing the photo spread. All three identifications were made with certainty.

(5) Time between crime and confrontation 

The crime occurred on March 11, 2006. The complainant first viewed the
photo spread on March 16, 2006 and again viewed the photo spread on April 7, 2006. 
Diaz viewed the photo spread on April 13, 2006. There was very little time lapse
between the time of the crime and the complainant's first positive identification of
appellant as assailant. The trial occurred on August 27, 2007. Between the time of
the crime and the time of the trial, the complainant had seen appellant's image twice
in the police photo spread and he had seen appellant once in person at a nightclub a
week prior to trial. Diaz had only seen appellant's image in the police photo spread
one time between the time of the crime and the start of the trial.

(6) Other circumstances 

Mathews took statements from nightclub manager Frank Cobas and patrons of
the nightclub. Mathews also had video images of appellant attempting to enter the
nightclub in the moments prior to the assault. Mathews gave admonishments to both
the complainant and Diaz to refrain from making an identification if either witness
was uncertain about his identification. 

We are unable to say that the pre-trial identification procedure used in this case 
led to a substantial risk of misidentification. 

 In-Court Identification

 Even if we had concluded that the out-of-court identification procedure was
impermissibly suggestive, we would still conclude that in-court identification
testimony by the complainant and Diaz was admissible. "[I]t is well established that,
even where the pre-trial identification procedure is impermissibly suggestive, in-court
testimony of an identification witness will still be admissible as long as the record
clearly reveals that the witness' prior observation of the accused was sufficient to
serve as an independent origin for the in-court identification." Jackson, 657 S. W. 2d
at 130. In Jackson, the Texas Court of Criminal Appeals, quoting Neil, explained:

 "It is, first of all, apparent that the primary evil to be avoided is 'a very
substantial likelihood of irreparable misidentification.' Simmons v. United
States, 390 U.S. [377, ] 384, 88 S.Ct. 967, 19 L. Ed.2d 1247 [(1968)]. While 
the phrase was coined as a standard for determining whether an in-court
identification would be admissible in the wake of a suggestive out-of-court
identification, with the deletion of 'irreparable' it serves equally well as a
standard for the admissibility of testimony concerning the out-of-court
identification itself. It is the likelihood of misidentification which violates a
defendant's right to due process, and it is this which was the basis of the
exclusion of evidence. . . . Suggestive confrontations are disapproved because
they increase the likelihood of misidentification, and unnecessarily suggestive
ones are condemned for the further reason that the increased chance of
misidentification is gratuitous. But . . . the admission of evidence of a showup
without more does not violate due process."


Jackson, 657 S.W.2d at 127 (quoting Neil, 409 U.S. at 198, 93 S.Ct. at 381-82
(1975)).

 Here, the record reveals that the in-court identifications had origins
independent of the complainant's and Diaz's having viewed the photo spread and
independent of the complainant's having subsequently seen appellant at the nightclub
prior to trial. The complainant identified appellant as the assailant definitively while
testifying in court by pointing him out to the jury during direct examination. Diaz
also quickly and clearly identified appellant as the assailant and pointed him out to
the jury during direct examination. Diaz reiterated his identification during cross-examination. Both witnesses testified that they were identifying appellant from
having observed him during the commission of the offense and not as a result of the
identification procedures. The complainant testified that appellant was standing
under a bright light when he began his assault. In addition, Diaz had viewed
appellant in the minutes before the assault when appellant and his party attempted to
enter the Palace Nightclub. Both the complainant and Diaz saw appellant standing
next to a white Chrysler 300 sedan under a direct light. Both the complainant and
Diaz saw appellant fire his weapon at the complainant. Both were definite and certain
in their identification of appellant as the assailant during their respective in-court
identifications. The gap between the time of the crime and the time of trial was not
so great as to render the complainant's and Diaz's memories of appellant as faint or
suspect. We conclude that the in-court identifications of appellant by the
complainant and Diaz had origins independent of their viewing the photo spread and
were admissible.

 To carry his burden of showing that his trial counsel was ineffective by failing
to move to suppress and by failing to object to the in-court identification testimony
by the complainant and Diaz, appellant had to show that the evidence was
inadmissible and, therefore, that the motion to suppress or the objection to the
identification testimony would have been properly granted. See Ortiz, 93 S.W.3d at
93; Jackson, 973 S. W. 2d at 957. We hold that appellant failed to carry his burden. 
Therefore, he failed to satisfy the first prong of Strickland. See 466 U.S. at 687-88.

 We overrule appellant's first point of error.

Legal and Factual Sufficiency 

 Appellant argues in his second and third points of error that the evidence
presented at trial was legally and factually insufficient to sustain his conviction.

Standard of Review

 To review the legal sufficiency of the evidence, we must view the evidence in
the light most favorable to the verdict and then determine whether a rational juror
could have found the essential elements of the offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 320-21, 99 S. Ct. 2781, 2790 (1979). "In
conducting this review, we do not reevaluate the weight and credibility of the
evidence, but act only to ensure that the jury reached a rational decision." Muniz v.
State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993). Evidence that is legally
sufficient to support a conviction may not be factually sufficient to support a
conviction. Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007). 

 "Evidence is factually insufficient to support the verdict if it is clearly wrong
or manifestly unjust or against the great weight and preponderance of the evidence."
Rollerson, 227 S.W.3d at 724. A factual sufficiency review involves three ground
rules. Lancon v. State, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008). First, we must
recognize that a jury has already passed on the facts and we must accord the jury the
proper deference to avoid substituting our judgment for that of the jury. Id. at 704-05
(citing Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996)). Second, when we
find the facts determined by the jury to be insufficient to affirm a conviction, we must
clearly lay out and explain how the evidence supporting the verdict is too weak on its
own, or how contradicting evidence greatly outweighs evidence supporting the
verdict. Id. at 705. Finally, we view all of the evidence in a neutral light when
conducting this review. Id. We may set aside a verdict only when the evidence
supporting the verdict is so weak as to render the verdict clearly wrong or manifestly
unjust. Id. (citing Cain v. State, 958 S.W.2d 404, 406 (Tex. Crim. App. 1997)). 

 Analysis

 A person commits aggravated assault if the person commits assault as defined
in Texas Penal Code section 22.01 and also uses or exhibits a deadly weapon during
the commission of the assault. See Tex. Penal Code Ann. § 22.02(a)(2) (Vernon
Supp. 2008). A firearm is a deadly weapon. Tex. Penal Code Ann. § 1.07(17)(A)
(Vernon Supp. 2008). (2) Evidence that an assailant aimed a deadly weapon at a
complainant is legally sufficient to sustain an aggravated assault conviction. 
Anderson v. State, 11 S.W.3d 369, 375-76 (Tex. App.--Houston [1st Dist.] 2000, pet.
ref'd). 

 Here, the complainant testified that appellant aimed a black firearm at him and
started shooting at him. He testified that appellant shot additional rounds and hit him
twice in the right leg and once in the left leg. The injuries he suffered from the
assault required him to stay in Hermann Memorial Hospital for five months and left
him unable to walk until he was able to retrain himself to do so. Diaz testified that
he watched appellant fire a black handgun that hit the complainant's leg. Diaz had
to fashion a tourniquet to stem the blood loss from the complainant's leg due to the
gunshots fired by appellant. In addition, Mathews testified that the nightclub's
security camera captured images of appellant and his party at the crime scene at the
time of the assault. He also testified that he discovered that appellant drove the white
Chrysler 300 after examining towing records and license plate information about the
vehicle. Viewing the evidence in a light most favorable to the verdict, a rational juror
could have found that appellant committed aggravated assault by causing serious
bodily injury to the complainant by using a firearm. Therefore, the evidence
presented at trial was legally sufficient to sustain appellant's conviction. 

 The defense did not present any countervailing evidence to the jury. We must
give due deference to the jury since it has already passed on the facts. Lancon, 253
S.W.3d at 704. We cannot say that the evidence presented to the jury is so weak as
to render its verdict clearly wrong or manifestly unjust. Id. at 705. 

 We overrule appellant's second and third points of error.


Conclusion

 We affirm the judgment of the trial court.





 

 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Alcala.

Publish. Tex. R. App. P. 47.4.
1. See U.S. Const. amend. VI; see also U.S. Const. amend. XIV.
2. See Tex. Penal Code Ann. § 1.07 (17)(A) (defining "deadly weapon" as "a firearm
or anything manifestly designed, made, or adapted for the purpose of inflicting death
or serious bodily injury").